# In the United States Court of Federal Claims

No. 13-747

(Filed Under Seal: July 29, 2021)

(Reissued: August 9, 2021)[1]

*****************************************
| JAMES S. GRILL, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * | Fifth Amendment; Regulatory Taking; Ripeness
| | * |
| THE UNITED STATES, | * |
| | * |
| Defendant. | * |
*****************************************

*James S. Grill*, Washington, CA, *pro se*.

*William James Shapiro*, U.S. Department of Justice, Environment & Natural Resources Division, Sacramento, CA, counsel for Defendant.

## OPINION AND ORDER

**DIETZ, Judge.**

James Grill, a *pro se* plaintiff, brings this case pursuant to the Takings Clause of the Fifth Amendment. The claim stems from the permitting system imposed and regulatory decisions made by the United States Forest Service with respect to conditions placed on his use of federal land to access his property. Before the Court are the parties' cross-motions for summary judgment. Because the Court finds that Grill never received a final decision regarding the extent of permissible access to his property through federal land, his takings claim is unripe and **DISMISSED** for lack of subject-matter jurisdiction.

## I. BACKGROUND

### A. The Property

This case revolves around a 240-acre multiparcel property ("the Property") located in Nevada County, California. Compl. ¶ 1. The Property is landlocked primarily by the Tahoe National Forest—a federal property managed by the United States Forest Service ("Forest

---

[1] This opinion and order was originally issued under seal on July 29, 2021. *See* ECF No. 97. The parties informed the Court that no redactions were necessary. *See* ECF No. 99. Thus, the Court publicly reissues the opinion and order in full.

Service"). *See* Def.'s Mot. for Summ. J. at 1, ECF No. 34 [hereinafter "Def.'s MSJ"]; ECF No. 34–1 at 24.[2] Scotchman Creek runs through the Property and crosses into federal land to the west, where it opens into a large waterfall next to an old mining dam. Def.'s MSJ at 1-2; ECF No. 34–1 at 24.

A roadway and trail system provided historical access to the Property across Scotchman Creek. Compl. ¶ 1. A private road ("the Historic Road") leads from a public highway northwest of the Property to Scotchman Creek, travelling across Tahoe National Forest land to the west of the Property. *Id.*; ECF No. 34–1 at 24. In the area around Scotchman Creek, the road "averag[es] about 0.75 meters in width" and is only "visible sporadically." ECF 1–1 at 18. Grill states that this road continues "to and across Scotchman Creek via a wet ford,[3] to the Property." Compl. ¶ 1. A Forest Service study, however, found that the road "continues to Scotchman Creek where it terminates before entering [the] Property." ECF No. 34–2 at 75.

Grill acquired the Property in the early 1990s.[4] Grill's ownership was contentious from the start, as he was cited by the Forest Service in 1992 for unpermitted road construction activity. *See* ECF No. 34–2 at 26. Grill, on behalf of the corporate entity that owned the land at the time, sued neighboring private landowners later that year in a dispute over his right to use a road through their lands. Compl. ¶ 2. A 1993 settlement of the suit permitted Grill to use the road with restrictions, specifically limiting development and commercial activity on the Property. ECF No. 34–3 at 9-10.

B.  **The Special Use Permit**

Grill also sought access to the Property from the Forest Service, applying for a Special Use Permit ("SUP") in 1992. *See* ECF 34–2 at 39-42. The application proposed to "[u]se existing historical access west of Scotchman Creek and construct a bridge across Scotchman Creek, then construct and rehabilitate approximately 600 feet of roadway on National Forest land for purposes of all weather access to the subject property." *Id.* at 39. In a 1994 letter to the Forest Service, Grill's attorney cited to the Alaska National Interest Lands Conservation Act ("ANILCA"), 16 U.S.C. § 3210(a), to inform the Forest Service that it was "required to provide reasonable access to non-federally owned land where no other access is reasonably available."

---

[2] Except where stated, the facts of this case are largely not in dispute. Both parties submit substantially the same documents in support of their motions. Where both parties have produced a document, the Court cites to the government's submission for ease. Due to inconsistencies in the names, pagination, and location of exhibits, the Court cites only to an exhibit's ECF number and its PDF page number.

[3] In this instance, Grill appears to use "wet ford" to mean simply that the road travels through Scotchman Creek. At other times, Grill uses the term to mean a specific type of road design that he proposed to build across the creek using culverts in the road to allow the water to pass through. *See* ECF No. 34–2 at 57, 60.

[4] Grill's ownership of the Property has a convoluted history that is not relevant to this decision by the Court. The Property changed hands several times between 1992 and 2008. *See* Oral Arg. Tr., ECF No. 46, 5:17-17:10. Suffice to say that Grill, either in his individual capacity or as the sole member of a trust or corporation, had ownership interest throughout this time span. *See id.* The government argues that these transfers invalidated Grill's SUP. *See* Def.'s MSJ at 30-31. Because the case is dismissed on other grounds, the Court does not decide this issue.

*Id.* The Forest Service responded that it was aware of ANILCA's requirements but that the access Grill sought "require[d] significant construction work including the installation of a bridge, not merely use of an existing road." *Id.* at 7. As such, the Forest Service informed Grill that he needed to comply with the environmental study requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq. Id.*

Grill and the Forest Service then undertook a series of studies to evaluate the viability of various potential access routes to the Property. A 1995 Draft Feasibility Study, prepared on behalf of Grill, analyzed the environmental and economic impact of five access options across different parts of Scotchman Creek and the South Yuba River to the north of the Property. *See* ECF No. 34–2 at 44-72. The study recommended a seasonal wet ford over Scotchman Creek, which would necessitate construction within the 100-year floodplain of the creek. *See id.* at 51, 72.

Pursuant to NEPA, the Forest Service released its Environmental Assessment ("EA") for Grill's SUP application later that year. *See* ECF No. 34–2 at 74. The EA analyzed seven different access options, including a "No Action" alternative in which the Forest Service would not grant the SUP. *Id.* at 79. The Forest Service rejected the "No Action" alternative because it would "preclude reasonable access to Mr. Grill's private property" in contravention of the requirements of ANILCA. *Id.* Instead, the Forest Service chose Alternative C, a bridge over Scotchman Creek, as the preferred alternative. *Id.* at 74. This alternative called for construction of a bridge that "would span the creek entirely" and would result in "no intrusion upon the creek and no altering of the stream bed." *Id.* at 79. Unlike Grill's preferred option in the Draft Feasibility Study, this bridge "would result in no fill being placed within the 100 year floodplain." *Id.* at 82.

The Forest Service issued its Decision Notice on November 27, 1995, selecting Alternative C for the purpose of granting Grill's SUP application. *See* ECF No. 34–2 at 87. The Decision Notice provided that the permit would "be issued in the winter of 1995/1996, and road construction may begin after that, weather permitting." *Id.* It further adopted the EA's requirement that the bridge would "result[] in no fill within the 100 year floodplain." *Id.* at 88. As required by NEPA, the Decision Notice also included a Finding of No Significant Impact ("FONSI"), stating that the project was not expected to "significantly affect the quality of the human environment." *Id.* at 90.

The SUP was issued three years later, on November 17, 1998, with a stated purpose "to gain vehicle access to private property, which is landlocked by National Forest System Lands." ECF No. 34–2 at 96. The permit had an expiration date of December 31, 2007, but provided that it would be reissued for successive 10-year periods if needed, at which time the Forest Service could add or modify conditions and stipulations. *Id.* at 99. Among other provisions, the permit required that "[a]ll construction or reconstruction of the road shall be in accordance with plans, specifications, and written stipulations approved by the Forest Service prior to beginning such reconstruction." *Id.* at 97. Construction plans—unsigned by the Forest Service—were attached to the SUP, but subsequent communications indicate that these plans had not yet been finalized. *See id.* at 106-30; *id.* at 132-34. On January 12, 1999, the Forest Service again informed Grill that

3

construction plans must be approved before construction could begin. *Id.* at 132. Grill responded the following month, confirming that he "would return the engineering plans and drawings for the bridge at a future date" and that no work would commence until the plans were approved. *Id.* at 134.

### C.  Submission of a Bridge Design

For several years after the issuance of the SUP, no progress occurred on the project, which Grill attributes to "many personal, planning and construction financing issues." Pl.'s Resp. to Def.'s Mot. for Summ. J. at 9, ECF No. 38 [hereinafter "Pl.'s Resp."]. In May 2006—a year and a half before the SUP was set to expire—Grill reinitiated discussions with the Forest Service, proposing a "new road alignment and bridge crossing location in place of the existing alignment and crossing as shown on the plans . . . that are part of the use permit." ECF No. 34–2 at 138. After the Forest Service expressed concern about the new bridge location during a site visit, Grill agreed to submit a design in accordance with the original plans. *See id.* at 148.

In April 2007, Grill submitted his completed engineering plans for the bridge over Scotchman Creek. *See* Compl. ¶ 8. The parties dispute whether these plans complied with that mandates of the EA, the Decision Notice, and the SUP. The plans contemplated a 25-foot bridge across the creek, which, according to the government, would "require a re-routing of the creek during construction and significant construction activities (including the sinking of several bridge abutments) within the active portion of the channel." Def.'s MSJ at 10. As such, the government argues that these plans contravened the requirement that the bridge was to "span the creek entirely" and "result in no fill being placed within the 100 year floodplain." *See id.* at 10-14; ECF No. 34 – 2 at 79, 82. For his part, Grill argues that these plans "exactly conformed" to those that were attached to the SUP with preliminary approval from the Forest Service. *See* Pl.'s Mot. for Summ. J., ECF No. 35, at 12 [hereinafter "Pl.'s MSJ"].

Whether or not the plans conformed with the original requirements, Greg Schimke of the Forest Service emailed Grill on July 31, 2007, stating: "The Forest Service has approved your submitted bridge design and will amend your existing special use permit for the road access, to allow immediate construction pending submittal of a Stream Alteration Permit . . . to be issued by the California Department of Fish and Game." *See* ECF No. 34–2 at 185. The California Department of Fish and Game ("California F&G") issued Grill the Streambed Alteration Permit on August 20, 2007. *Id.* at 203. With all necessary permits in place, Grill made preparations to begin construction on the bridge. Pl.'s MSJ at 12.

### D.  Termination of the Permits

A sudden series of events then led to the suspension of the Streambed Alteration Permit, rejection of the bridge design, the expiration and nonrenewal of the SUP, and, ultimately, this lawsuit.

On September 12, 2007—just weeks after California F&G issued its permit—Rick Weaver, a hydrologist for the Forest Service, emailed Bob Hosea of California F&G to express "some concerns about the conditions of [the] Stream Alteration Agreement." ECF No. 34–1 at 51. Among the concerns, Weaver indicated that the stream channel at the proposed location was wider than the permit appeared to consider and contained significant riparian vegetation. *Id.* Weaver also stated that he observed two "foothill yellow-legged frogs at the proposed bridge site." *Id.* A week after Weaver's letter, California F&G suspended Grill's Streambed Alteration Permit due to "previously undisclosed, significant information concerning [the] project." ECF No. 34–2 at 205. In a letter to Grill, Hosea listed reasons for the permit suspension, including the possible presence of protected species, mercury contamination,[5] and the significant amount of riparian vegetation. *Id.*

Two weeks later, on October 7, 2005, the Forest Service issued Grill a letter rejecting his proposed bridge design ("the Rejection Letter"). ECF No. 34–2 at 208. The letter stated that the bridge "does not meet the environmental requirements that were part" of the EA because the "drawings do not depict a bridge which completely spans the creek, and fill would be necessary within the 100 year floodplain." *Id.* The letter continued that, because the permit was set to expire and because over ten years had passed since the original EA, a revised EA would be required. *Id.* Finally, the Rejection Letter instructed Grill, "You may not cross the creek with machinery or vehicles until you have obtained a State of California, Department of Fish and Game Stream Bed Alteration Permit, and until you have written authorization from the Forest Service District Ranger." *Id.*

On April 2, 2008, the Forest Service sent a letter to Grill's attorney, explaining that the SUP had expired by its own terms on December 31, 2007 ("the Expiration Letter"). ECF No. 34–2 at 212. The Expiration Letter explained, "As the permit use was never established by maintenance and use of the road, or construction of the bridge, it is appropriate that the permit terminated." *Id.* The letter reiterated the obligations of the Forest Service under ANILCA but informed Grill that he would need to comply with the permitting requirements to secure any future proposed use. *Id.*

## II.   PROCEDURAL HISTORY

### A.   District Court Case

Following the events that led to the expiration of Grill's SUP, Grill filed a lawsuit in the Eastern District of California. *See Grill v. Quinn*, No. 2:10-CV-0757 GEB GGH, 2013 WL 3146803 (E.D. Cal. June 18, 2013), *report and recommendation adopted,* No. 2:10-CV-0757

---

[5] It appears that Grill himself informed the Forest Service of possible mercury contamination in an attempt to collect compensation. In July 2007, Grill commissioned an investigation into mercury and silt pollution in Scotchman Creek. *See* ECF No. 34–2 at 151-59. The study concluded that historic pollution of the creek rendered the Property "a toxic waste dump" and "unmarketable." *Id.* at 158. The study proposed "the responsible parties' purchase of the Property" as a remedy for the damage to the value of the property. *Id.*

GEB GGH, 2013 WL 3992117 (E.D. Cal. Aug. 1, 2013), *aff'd,* 748 F. App'x 122 (9th Cir. 2019). In his amended complaint, Grill alleged violations of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, and procedural due process based on the "Forest Service's alleged arbitrary termination of the SUP" without the opportunity for appeal. *Id.* at *7.

The district court ruled that Grill lacked standing as to his APA claim because, after the property was foreclosed upon in 2012, no relief was available to Grill under the APA. *Id.* at *17. The court concluded that Grill could not obtain injunctive relief—the only type of relief available in APA claims—because he was no longer the owner of the property for which the SUP was issued. *Id.* Further, the court determined that Grill should have been given an opportunity to appeal the decisions of the Forest Service but that his procedural due process claim for monetary damages was barred by sovereign immunity. *Id.* at *33-34. Accordingly, the district court dismissed Grill's case. *Id.* at *35.

### B. Court of Federal Claims

Proceeding *pro se*, Grill filed his claim in this Court on September 26, 2013, alleging that the Forest Service committed a taking of his private property in violation of the Fifth Amendment of the United States Constitution. *See generally* Compl. On April 10, 2015, the parties filed cross-motions for summary judgment. Since that time, the motions have been extensively briefed, supplemented, argued, and reargued.[6] After the case was reassigned to the undersigned on January 5, 2021, the Court held a second oral argument on May 14, 2021. Though both parties make several arguments in support of their motions, the government's primary argument—and the only argument that the Court needs to address for this decision—is that Grill's claim for a regulatory taking is unripe because he never received a final decision from the Forest Service.

## III. LEGAL STANDARDS

### A. Takings Claims

The Takings Clause of the Fifth Amendment prohibits the Government from taking "private property . . . for public use, without just compensation." U.S. Const. amend. V. This Court follows the Federal Circuit's two-step inquiry in takings cases: first, whether the plaintiff possessed a "valid property interest at the time of the taking[,]" and second, "whether the governmental action at issue amounted to a compensable taking of that property interest." *Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004) (internal quotation omitted). Depending on the nature of the governmental action, a taking is classified as either physical or regulatory. *See Washoe Cty., Nev. v. United States*, 319 F.3d 1320, 1326 (Fed. Cir. 2003) (citing *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1014-15 (1992)). Generally, a physical taking occurs "when the government encroaches upon or occupies private land for its own proposed use." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001). A regulatory taking,

---

[6] *See* ECF Nos. 34, 35, 36, 38, 40, 41, 43, 44, 47, 50, 53, 54, 58, 59, 62, 65, 69, 70, 72, 73, 75, 80, 81.

on the other hand, occurs when the government "goes too far" in regulating the use of property. *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922).

Absent certain exceptions discussed later in this opinion, a claim for a regulatory taking "is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186 (1985), *overruled on other grounds by Knick v. Twp. of Scott*, 139 S.Ct. 2162, 2179 (2019). "The ripeness doctrine is designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Martin v. United States*, 894 F.3d 1356, 1362 (Fed. Cir. 2018) (internal quotations omitted). The rationale for this final decision requirement derives from the fundamental inquiry of regulatory takings—that is, before a court can determine whether a regulation "goes too far," it, naturally, must first be able to identify exactly how far the regulation goes. *See MacDonald, Sommer & Frates v. Yolo Cty.*, 477 U.S. 340, 348 (1986).

B.    **Ripeness and Subject-Matter Jurisdiction**

The ripeness of a regulatory takings claim is a threshold consideration that a court must resolve before it may address the merits of the claim. *McGuire v. United States*, 707 F.3d 1351, 1357 (Fed. Cir. 2013) (citing *Palazzolo*, 533 U.S. at 618). This is a jurisdictional inquiry and thus must be analyzed under the RCFC 12(b)(1) standard. *Bassett, New Mexico LLC v. United States*, 136 Fed. Cl. 81, 88 (2018), *aff'd,* 771 F. App'x 479 (Fed. Cir. 2019). Where a claim is not ripe, it must be dismissed for lack of subject-matter jurisdiction. *See Freeman v. United States*, 875 F.3d 623, 625 (Fed. Cir. 2017).

Therefore, the government's argument that Grill's claim is unripe should have been brought as a motion to dismiss for lack of subject-matter jurisdiction rather than as part of its motion for summary judgment. Because the Court decides the case on ripeness grounds, it is appropriate to treat the government's motion for summary judgment as a motion to dismiss. *See Lockheed Martin Corp. v. United States*, 50 Fed. Cl. 550, 552 (2001); *Fid. & Deposit Co. of Maryland v. United States*, 2 Cl. Ct. 137, 142 (1983). Alternatively, because "a court has a duty to inquire into its jurisdiction to hear and decide a case," *Special Devices, Inc. v. OEA, Inc.*, 269 F.3d 1340, 1342 (Fed. Cir. 2001), the Court may treat the motion for summary judgment "as a 'suggestion' of lack of subject matter jurisdiction" and conduct an inquiry on its own. *Indium Corp. of Am. v. Semi-Alloys, Inc.*, 781 F.2d 879, 884 (Fed. Cir. 1985). Either way, it is proper for the Court to analyze its jurisdiction over Grill's claim, despite the improper styling of the government's motion.

A plaintiff "has the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Banks v. United States*, 741 F.3d 1268, 1277 (Fed. Cir. 2014). Though a *pro se* plaintiff is afforded a liberal reading of his pleadings, he is not excused from his burden of proving the court's jurisdiction. *Golden v. United States*, 129 Fed. Cl. 630, 637 (2016). When considering a motion to dismiss for lack of jurisdiction, "a court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor

of the plaintiff." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011). However, "[a] trial court may weigh relevant evidence when it considers a motion to dismiss that challenges the truth of jurisdictional facts alleged in a complaint." *Ferreiro v. United States*, 350 F.3d 1318, 1324 (Fed. Cir. 2003).

### IV. DISCUSSION

Grill's claim may be understood as three different, but substantially overlapping, regulatory takings claims. First, Grill contends that the Forest Service's instruction not to cross Scotchman Creek via the Historic Road constituted a taking of an easement statutorily granted by Revised Statute 2477 ("R.S. 2477"), Act of July 26, 1866, 43 U.S.C. § 932 (1866) (repealed 1976). *See* Compl. ¶¶ 47, 58. Second, Grill contends that the Forest Service's decision not to renew his SUP constituted a taking of an easement statutorily granted by ANILCA. *See* Compl. ¶¶ 47, 58. Third, Grill contends that these two actions constituted a taking of the Property through denial of access. *See* Compl. ¶¶ 56, 57. The distinction between these three alleged takings is largely lost throughout the briefings—perhaps understandably so, as each reduces, for practical purposes, to a claim that the Forest Service went "too far" in regulating Grill's access the Property.

Critical to this decision, the ripeness inquiry for each of the alleged takings is the same. Namely, did Grill obtain, or was he excused from obtaining, a final decision from the Forest Service regarding the extent to which it would impose conditions on Grill's access to the Property across federal land? The Court answers in the negative and, therefore, must dismiss the case as unripe.

### A. Wrongfulness of Government Conduct

As an initial matter, the Court notes a flaw, pervasive throughout Grill's pleadings and briefings, with his allegations that the Forest Service acted, among similar descriptors, "unlawfully, arbitrarily, unilaterally, unfairly and wrongfully." [7] Compl. at 1; *see generally id.* The wrongfulness of governmental conduct is not the proper inquiry in takings cases. *See Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 802 (Fed. Cir. 1993) ("[A] claimant must concede the validity of the government action which is the basis of the taking claim to bring suit under the Tucker Act, 28 U.S.C. § 1491."). "[A]n uncompensated taking and an unlawful government action constitute 'two separate wrongs [that] give rise to two separate causes of action . . . .'" *Rith Energy, Inc. v. United States*, 247 F.3d 1355, 1365 (Fed. Cir. 2001) (quoting *Del-Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1364 (Fed. Cir. 1998)). "[A] plaintiff may sue in the Court of Federal Claims on a takings claim regardless of whether the government's conduct leading to the taking was wrongful, and regardless of whether the plaintiff

---

[7] In his summary judgment briefings, Grill relies heavily on such arguments, asserting at various times, for example, that the Rejection Letter was unjustified because it was based on inaccurate information, Pl.'s MSJ at 17; that the Expiration Letter was "[w]ithout '[c]ause' which is [u]nlawful under ANILCA[,]" *id.* at 27; that the Expiration Letter "was without Due Process[,]" *id.* at 31; and that the Forest Service exceeded its statutory authority and violated its own policies by regulating Grill's alleged right-of-way under R.S. 2477, Pl.'s Reply at 12-15.

could have challenged the government's conduct as wrongful in another forum." *Del-Rio*, 146 F.3d at 1364. In the context of a takings claim before this Court, however, the Federal Circuit has identified an important distinction:

> [I]f the plaintiff claims that its property was taken *regardless of* whether the agency acted consistently with its statutory and regulatory mandate, *Del-Rio* stands for the proposition that the takings claim can be litigated in the Court of Federal Claims without the need to first litigate the issue of lawfulness in administrative proceedings before the agency. On the other hand, to the extent that the plaintiff claims it is entitled to prevail *because* the agency acted in violation of statute or regulation, *Del-Rio* does not give the plaintiff a right to litigate that issue in a takings action rather than in the congressionally mandated administrative review proceeding.

*Rith*, 247 F.3d at 1365-66 (emphasis in original). In other words, while allegations of the wrongfulness of governmental conduct do not preclude a takings claim, neither do they establish one.

Accordingly, the function of the Court in Grill's takings case is not to evaluate whether the Forest Service, for example, abused its discretion, exceeded its statutory authority, or ought to have reached a different decision with respect to its permitting requirements or Grill's bridge design. Such questions were before the district court in Grill's APA and Due Process claims,[8] *see Grill*, 2013 WL 3146803, and thus cannot be relitigated under the guise of a takings claim. *See Rith*, 247 F.3d at 1366.

In pointing this out, the Court does not purport to identify a fatal defect in Grill's claim but instead clarifies that a taking is not established by showing that a governmental action was wrongful. To be sure, intermingled with Grill's arguments unfit for a takings claim are the properly pleaded elements of a regulatory taking. Specifically, Grill identifies his alleged compensable property interests and the regulatory actions that he alleges took those interests.

### B.     Grill's Alleged Regulatory Takings

At its heart, Grill's claim involves the limitations on his ability to traverse federal land to access his property. Grill argues that he derives rights-of-way over federal land from two statutory sources—ANILCA and R.S. 2477—and that such rights-of-way are property interests

---

[8] An APA claim allows a court to review agency actions that are:
    (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
    (B) contrary to constitutional right, power, privilege, or immunity;
    (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
    (D) without observance of procedure required by law;
    (E) unsupported by substantial evidence . . . ; or
    (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
5 U.S.C. § 706(2).

protected by the Fifth Amendment. *See* Pl.'s Resp. at 35-36; Pl.'s Reply at 13. The Court provides a brief overview of these statutes to contextualize the regulatory takings analysis that follows.

        1.        <u>The Regulatory Framework</u>

Enacted in 1980, ANILCA requires that the Secretary of Agriculture "provide such access to nonfederally owned land within the boundaries of the National Forest System as the Secretary deems adequate to secure to the owner the reasonable use and enjoyment thereof . . . ." 16 U.S.C. § 3210(a). An inholder's access, however, is not unfettered, as he or she must "comply with rules and regulations applicable to ingress and egress to or from the National Forest System." *Id.* Such rules and regulations are set forth in 36 C.F.R. § 251.110, *et seq.*, which includes a provision that requires a landowner to "apply for and receive a special-use or road-use authorization" if the access would require "surface disturbance" or a usage greater than that afforded to the general public. 36 C.F.R. § 251.110(d).

R.S. 2477, which Grill cites as establishing access to the Property via the Historical Road across Scotchman Creek, stated that "the right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted." 43 U.S.C. § 932. Though R.S. 2477 was later repealed, the repealing statute "specified that any 'valid' R.S. 2477 rights of way 'existing on the date of approval of this Act' . . . would continue in effect." *S. Utah Wilderness Alliance v. Bureau of Land Mgmt.*, 425 F.3d 735, 740 (10th Cir.) ("*SUWA*") (quoting Federal Land Policy Management Act of 1976, Pub.L. No. 94-579 § 701(a) (1976)). R.S. 2477 "has spawned some of the 'more contentious land use issues in the West," *Martin*, 894 F.3d at 1361 (quoting *SUWA*, 425 F.3d at 740), due in large part to the fact that "the establishment of R.S. 2477 rights of way required no administrative formalities" or documentation. *SUWA*, 435 F.3d at 740.

Though the rules of ingress and egress applicable to ANILCA rights-of-way specifically "do not affect rights-of-way established under authority of R.S. 2477," 36 C.F.R. § 251.110(b), these roads "are nonetheless subject to the Forest Service regulation." *Clouser v. Espy*, 42 F.3d 1522, 1538 (9th Cir. 1994). Under 16 U.S.C. § 551, the Forest Service has "broad powers . . . to regulate roads for the good of the forests." *Skranak v. Castenada*, 425 F.3d 1213, 1217 (9th Cir. 2005) (citing *Clouser*, 42 F.3d at 1538). "[E]ncompassed within that grant is the authority to regulate use of R.S. § 2477 roads where such is necessary to carry out [the Department of] Agriculture's statutory duty to protect national forests against 'depredations.'" *Clouser*, 42 F.3d at 1538 (quoting 16 U.S.C. § 551). Thus, even if we ignore the aforementioned principle that a takings claimant must operate under the premise that the governmental action was valid, it is apparent that the Forest Service did have authority to regulate Grill's alleged R.S. 2477 easement, despite Grill's argument to the contrary. *See id.* ("[R]egardless whether the trails in question are public highways under R.S. § 2477, they are nonetheless subject to the Forest Service regulation."); *Skranak*, 425 F.3d at 1217-18 ("[F]ederal agencies like the Forest Service often have regulatory powers over easements and other property interests, including, presumably, the ability to require permits and put conditions on use."); *Fitzgerald v. United States*, 932

10

F.Supp. 1195, 1201 (D. Ariz. 1996) ("[A]n easement under R.S. 2477 is still subject to reasonable Forest Service regulations."). *Cf. United States v. Volger*, 859 F.2d 637, 642 (9th Cir. 1988), *cert. denied*, 488 U.S. 1006 (1989) ("Even if we assume that the trail is an established right of way [under R.S. 2477], we do not accept Volger's argument that the government is totally without authority to regulate the manner of its use.").

2. The Takings Framework

Because the case is dismissed on ripeness grounds—a threshold consideration—the Court does not decide but rather assumes the existence of these statutory "easements" as compensable property interests.[9] *See Martin*, 894 F.3d at 1363 ("Even assuming *arguendo* that the Inholders possess valid Revised Statute 2477 easements, their claim that the Forest Service permitting requirements work a compensable regulatory taking is not ripe for review."). The Court notes, however, that the Federal Circuit has recognized the "general rule that the owners of property enjoy a right of reasonable access to their property." *Palmyra Pac. Seafoods, L.L.C. v. United States*, 561 F.3d 1361, 1371 (Fed. Cir. 2009) (citing *Bydlon v. United States*, 175 F.Supp. 891, 897-98 (Ct. Cl. 1959)). "[A] regulation that prevents a property owner from accessing private property would implicate a cognizable property interest for purposes of the Fifth Amendment." *Id.* Thus, regardless of the statutory basis, it is clear that Grill possessed a right to access the Property.

Equally clear, however, is the right (and responsibility) of the Forest Service to regulate travel across federal land, *supra* Section IV.B.1, so long as the government action does not go too far in burdening a right to access. One instance, as relevant here, in which the government will be deemed to have gone too far is where it "denies 'all feasible routes' of access to a plaintiff's property." *McGuire v. United States*, 97 Fed. Cl. 425, 439 (2011) (quoting *Laney v. United States*, 661 F.2d 145, 149 (Ct. Cl. 1981)). Denial of access claims—a subset of takings claims—may be "analyzed under a physical takings framework or regulatory takings framework" depending on the facts underlying the claim. *See Bassett*, 136 Fed. Cl. at 85. Such a distinction is important, as physical takings, also known as *per se* takings, do not face the same ripeness requirement as regulatory takings. *See id.* at 86; *see also Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1355 (rejecting plaintiff's attempt "to convert a[n unripe] regulatory takings claim . . . into a per se taking governed by [a] more generous rule"). Where the alleged denial of access is the result of a regulatory decision, the resulting taking is analyzed under the regulatory takings framework. *See Bassett*, 136 Fed. Cl. at 85-86 (analyzing cases).

Thus, consistent with the complaint, Grill's claims are properly characterized as regulatory takings. *See* Compl. at 1 (alleging "a taking of private property . . . as a result of a

---

[9] The Court does not decide the disputes over whether the SUP, issued pursuant to ANILCA, constituted a compensable property interest and whether Grill possessed a valid easement under R.S. 2477. For his part, Grill draws on language from his district court case to argue that "the SUP was akin to an easement, revocable only for cause." Pl.'s MSJ at 28 (quoting *Grill*, 2013 WL 3146803, at *17). Further, Grill argues that the Historic Road was established as an R.S. 2477 easement through public use since 1866, as confirmed by an archaeological study. Pl.'s Reply at 12; *see also* ECF No. 43–2 at 26.

11

regulatory decision"); *see also* Joint Prelim. Status Report at 2, ECF No. 7 ("The parties note that, at this time, Plaintiff raises only a regulatory takings claim, not a physical takings claim."). Grill's claims here are not based on any physical impediments to his access but rather the imposition of regulations in the form of permitting requirements, and therefore the claims are subject to the ripeness doctrine of regulatory takings.

### C.    Ripeness of the Alleged Regulatory Takings

The Court concludes that Grill never received a final decision from the Forest Service regarding the extent of permissible access to the Property. None of the agency's actions imposed definable limitations on Grill's access or foreclosed the possibility that he would be permitted access if he complied with the applicable procedures and conditions. Nor can Grill establish that future applications for access would be futile, or that the Forest Service avoided a final decision through extraordinary delay or unfair or repetitive procedures, as would be sufficient to excuse Grill from the final decision requirement. Accordingly, Grill's claims are unripe for a decision on the merits.

#### 1.    Final Decision Requirement

A regulatory takings claim "simply cannot be evaluated until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question." *Williamson Cty.*, 473 U.S. at 191. This final decision requirement compels a landowner to "follow[] reasonable and necessary steps to allow regulatory agencies to exercise their full discretion in considering" proposed uses of land before bringing a regulatory takings claim. *Palazzolo*, 533 U.S. at 620. "Where further administrative process could reasonably result in a more definite statement of the impact of the regulation, the property owner is generally required to pursue that avenue of relief before bringing a takings claim." *Morris v. United States*, 392 F.3d 1372, 1376 (Fed. Cir. 2004). "[U]ntil these ordinary processes have been followed the extent of the restriction on the property is not known and a regulatory taking has not yet been established." *Palazzolo*, 533 U.S. at 621.

Where an agency's administrative process includes a permit requirement, "a taking does not ripen unless a permit is applied for *and denied*." *Boise Cascade*, 296 F.3d at 1351 (emphasis added). The mere imposition of such a requirement cannot constitute a taking because "the very existence of a permit system implies that permission may be granted." *Riverside Bayview*, 474 U.S. at 126-27. To ripen a claim, a permit must be denied on its merits as opposed to removed from consideration for procedural defects. *See Howard W. Heck & Assocs., Inc. v. United States*, 134 F.3d 1468, 1472 (Fed. Cir. 1998). A claim is unripe, for example, when a landowner fails to complete an application or submit additional information required by the agency responsible for the decision. *Bassett*, 136 Fed. Cl. at 88.

Simply put, the actions at issue were not final decisions by the Forest Service that served to ripen Grill's regulatory takings claims. By instructing Grill not to cross Scotchman Creek without a permit and not renewing the SUP after its expiration, the Forest Service did not reach a

final decision on Grill's access but rather imposed—or, perhaps more accurately, reimposed—a permitting system with which Grill was always required to comply. Notably, each of these actions came with instructions for how Grill could obtain his desired access. Use of the Historic Road to cross Scotchman Creek required a state permit and written authorization from the Forest Service. ECF No. 34–2 at 209. Given the SUP's impending expiration and the time that elapsed since its issuance, the Forest Service determined that any bridge construction required additional environmental studies and, ultimately, a new SUP application. *Id.* at 208; ECF No. 34–2 at 212. Only through completion of these administrative processes could the Court be in a position to determine the extent to which the Forest Service's regulations restricted Grill's use of the Property, if at all.

First, Grill faces an unwinnable predicament over the dispute regarding his access via the Historical Road over Scotchman Creek. If we take Grill's word that he "continually used the Historic Road via the wet ford to access the property with 4 wheel drive vehicles" during his ownership of the property, ECF No. 47–1 at 3, then the Rejection Letter's instruction not to cross the creek without a permit was simply the *first* time the Forest Service imposed such a requirement. As stated, the mere imposition of this requirement cannot serve to ripen Grill's claim because it leaves open the possibility that a permit, if applied for, may be granted. On the other hand, if we accept the government's argument that the SUP was issued *because* Grill did not have access via this road, then the Rejection Letter had no effect on Grill's existing access rights but to reinforce the permitting system required for access. In either instance, the claim for a taking of this right of access is not ripe until Grill complies with the permitting requirements.

Grill did not apply for a permit but rather points to a single communication from the Forest Service after the Rejection Letter to argue that the Forest Service "double[d] down" on this restriction. *See* Pl.'s Suppl. Brief at 15, ECF No. 50. The referenced letter—dated August 8, 2008—detailed the requirements of the permitting system and informed Grill that even if he complied, "it would not guarantee that the decision would be made to allow the improvement and use of this access, if resource issues could not be sufficiently mitigated." ECF No. 50–11 at 1-2. This is not a permit denial but rather a statement of the nature of the permitting system—that, if applied for, a permit may be granted or denied. Grill was required to allow the Forest Service to make that determination before a court could entertain the claim that the Forest Service committed a Fifth Amendment taking of the alleged R.S. 2477 easement.

Next, the decision not to renew Grill's existing SUP was not the equivalent of a *denial* of the permit because it was not a merits-based determination. The Forest Service did not make a decision regarding Grill's substantive access rights or deny any use proposed by Grill; rather, throughout the SUP application process and in the Expiration Letter, the Forest Service consistently and explicitly acknowledged that it was "obligated by [ANILCA] to provide reasonable access to private lands surrounded by National Forest System Lands." ECF No. 34–2 at 75; *see also* ECF No. 34–2 at 88; ECF No. 34–2 at 96; ECF No. 34–2 at 213. Thus, though the requirement of a new SUP application may have set back Grill's progress, he was left with the same access rights as existed before the issuance of the initial SUP and in the ten years that

13

followed—namely, "a statutory right to reasonable access, subject to conditions determined by the Forest Service." ECF No. 34–2 at 213.

The facts here make for a compelling, albeit ultimately unsuccessful, argument that Grill has, in fact, followed the "reasonable and necessary steps" to receive a final decision from the Forest Service. Grill rebuffs the government's attempts to compare his case to those in which a claim is dismissed as unripe because of a plaintiff's outright refusal to complete permit application requirements. *See, e.g.*, Pl.'s Resp. to Def.'s Notice of Supplemental Authority, ECF No. 69. For example, the Federal Circuit in *Martin* affirmed the dismissal of a claim as unripe where there was "no indication in the record that the Inholders . . . applied for a special use permit" to reconstruct alleged R.S. 2477 easements. *Martin* 894 F.3d at 1363; *see also McGuire*, 707 F.3d at 1360 (dismissing a claim as unripe where the claimant "never submitted a written permit application or plans to reconstruct the bridge"). Undeniably, Grill engaged in the administrative process more extensively than such claimants. Grill funded several studies as part of a multiyear SUP application process and ultimately received short-lived approval to begin construction on his bridge.

However, once the Forest Service imposed the requirement for a revised Environmental Assessment, the revision became a reasonable and necessary step with which Grill was required to comply. "Governmental agencies that implement complex permitting schemes should be afforded significant deference in determining what additional information is required to satisfy statutorily imposed obligations." *Wyatt*, 271 F.3d at 1098. Thus, the Forest Service retained discretion to require a revised environmental study to ensure the preservation of forest system land, particularly in light of new agency policies and previously unknown environmental considerations. *See* ECF No. 34–2 at 212. The Rejection Letter informed Grill of this additional requirement and invited him to initiate discussions with the Forest Service regarding its completion. ECF No. 34–2 at 209. Grill's failure to do so, coupled with the expiration of the SUP by its own terms, led to the Forest Service's decision to require a new SUP application. Devoid of any denial of Grill's substantive right of access, the nonrenewal was more akin to a withdrawal from consideration for procedural defects. Thus, though the facts may be distinguishable from those cases in which the plaintiff failed to engage with the process entirely, the principle applies equally: Grill's claim is not ripe "[u]ntil there has been a final decision on whether and under what conditions" he will be permitted access to the Property. *See Martin*, 894 F.3d at 1364 (punctuation omitted).

As it stands, none of the Forest Service's actions foreclosed the possibility that future access would be granted or placed definable limitations on such potential access. At most, the Forest Service eliminated a single bridge design, which did not narrow the scope of Grill's access in a definable manner. In this regard, Grill misstates the effect of the initial SUP application process as "unilaterally disqualif[ying] all other bridge designs" aside from that which was ultimately rejected. Pl.'s Resp. at 17. Relying on such a characterization, Grill presents the rejected bridge design as his one last hope, so to speak, of obtaining access to his property, arguing that the rejection of the bridge design and nonrenewal of the SUP "prohibit[ed]

14

all access routes" and "terminated the only alternative route selected by the [Decision Notice], Alternative C." *Id.*

This argument is unavailing, as the selection of Alternative C in the Decision Notice did not preclude all bridge designs except for the one that was eventually rejected. Rather, the Forest Service selected the access route to which it was most amenable of those that were presented and set forth general construction guidelines that could have been met by any number of bridge designs. Those guidelines contemplated a bridge over Scotchman Creek that would "result[] in no fill within the 100 year floodplain." ECF No. 34–2 at 87-88. Nothing in the Decision Notice suggests that a 25-foot bridge, as eventually proposed and rejected, was the only possible bridge that could meet these specifications. In fact, the Forest Service's rejection of the bridge design was based on its evaluation that the bridge did not meet the specifications. Regardless of whether the proposed bridge complied with the requirements, the Forest Service did not decide—or have opportunity to decide—whether to approve an alternative bridge design that would provide Grill with the same access as would his proposed bridge. As such, the Forest Service's exercise of discretion rejected a single bridge design, not an entire right of access.

The Forest Service arguably should have operated with a different procedure with respect to the expiration of the SUP, especially given the sudden reversal of approval of the proposed bridge design. But, as discussed, the question of whether the Forest Service should have acted a certain way under its regulations or under the terms of the SUP is not before the Court. Grill challenged the procedural aspects of the Forest Service's decision in his APA claim and due process claim in district court, as was proper. The Court here cannot relitigate those procedural issues but instead concludes that, for the purposes of Grill's takings claim, the Forest Service did not make any merits-based decisions on Grill's substantive access rights.

It is undisputed that Grill did not seek a new permit after the Rejection Letter and the Expiration Letter. Had Grill applied for a permit and been denied, or had he received definable limitations on the scope of his access, the Court would be in a better position to analyze whether those actions effectuated a taking. As it stands, the absence of a final decision from the Forest Service frustrates any analysis regarding the extent to which the government interfered, if at all, with Grill's access rights. The Forest Service never terminated Grill's alleged easements, to the extent that they existed; rather, it merely required Grill to comply with the existing permitting process before building a bridge and traversing federal land. Because Grill disengaged with that process before the Forest Service issued a final decision, his claim is unripe for review.

2. <u>Exceptions to Final Decision Requirement</u>

The final decision requirement has limited exceptions, none of which apply here. Under the futility exception, a property owner is not "required to submit *multiple* applications when the manner in which the first application *was rejected* makes it clear that no project will be approved." *Heck*, 134 F.3d at 1471 (quotations omitted) (emphasis in original). Further, an agency "may not burden property by imposition of repetitive or unfair land-use procedures in order to avoid a final decision." *Palazzolo*, 533 U.S. at 621. Finally, an agency's "extraordinary

delay in governmental decision making" may effectuate a taking. *Wyatt*, 271 F.3d at 1098 (quotations omitted).

Grill alleges these exceptions only in a conclusory manner and has not met his burden to show that they apply. *See, e.g.*, Pl.'s Resp. at 20 (arguing that requiring another SUP application was "unjust, inequitable, and repetitive"). A subtext of devious motivation lingers beneath Grill's narrative of the Forest Service's eleventh-hour about-face. In particular, Grill takes issue with Weaver's email to the California F&G, arguing that the Forest Service "falsely induced" the state agency to rescind its permit. But the record and Grill's vague allegations are insufficient to overcome the "long-recognized presumption that government officials act in good faith." *Freeman*, 875 F.3d at 630-31 (quotations omitted). Communications between the parties indicate the Forest Service's willingness to evaluate fairly a future SUP application, and Grill's failure to submit such an application cannot be excused as futile based on the record before the Court.

Nor has Grill shown that the Forest Service has avoided a final decision through extraordinary delay or unfair and repetitive procedures. Extraordinary delay generally requires a finding of bad faith on the part of the government. *Wyatt*, 271 F.3d at 1098. Especially relevant here, a court "must recognize that delay in the permitting process may be attributable to the applicant as well as the government." *Id.* Whatever his reasons, Grill waited nearly ten years—the entire lifespan of the SUP—to initiate progress on his planned construction. It is not unreasonable to expect that, in the intervening years, new environmental concerns would arise necessitating further studies. While the Court appreciates the time and cost associated with such studies and an additional SUP application process, they do not rise to the level of unfair and repetitive to excuse Grill from their undertaking. Faced with his first roadblock, Grill disengaged from the permitting process and failed to make even a single reapplication, electing instead to initiate multiple litigations. Grill's frustration with the process and its associated costs, while understandable, does not excuse the absence of a final decision for the purposes of a takings claim.

## V.     CONCLUSION

For the reasons above, the Court does not have jurisdiction over Plaintiff's unripe takings claim. Accordingly, Defendant's motion, treated as a motion to dismiss, is **GRANTED**. The case is **DISMISSED WITHOUT PREJUDICE** for lack of subject-matter jurisdiction. Plaintiff's motion for summary judgment is **DENIED AS MOOT**. The Clerk of Court is directed to enter judgment accordingly.

On or before **August 12, 2021**, the parties are directed to **CONFER** and **FILE** a notice of filing, attaching any proposed redactions for this opinion.

**IT IS SO ORDERED.**

s/ Thompson M. Dietz<br>THOMPSON M. DIETZ, Judge